**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MERGE HEALTHCARE INCORPORATED, a Delaware corporation, | |
| Plaintiff, | |
| v. | Case No. |
| MEDSTRAT, INC., a Delaware corporation; MEDICAL IMAGING RESOURCES, LLC a California limited liability company; MARK BOWMAN, an individual; TED HUSS, an individual; and WILLIAM CARR, an individual. | JURY DEMAND |
| Defendants. | |

## COMPLAINT

Plaintiff Merge Healthcare Incorporated ("Merge"), as and for its Complaint against Defendants Medstrat, Inc. ("Medstrat"), Mark Bowman ("Bowman"), Medical Imaging Resources, LLC ("MIR"), Ted Huss ("Huss"), and William Carr ("Carr") (Medstrat, Bowman, MIR, Huss, and Carr, collectively, "Defendants"), states and alleges as follows:

## Introduction

1.      This is a suit for damages and injunctive relief arising out of Medstrat's (both directly through its own employees Bowman and Carr, as well as indirectly through its agents MIR and Huss) deliberate and aggressive unfair competition, product disparagement, and tortious interference against Merge, one of Medstrat's competitors in the field of medical-imaging technology and services.  Over at least the past several months, Defendants, in an effort to convert to Medstrat a specific group of Merge customers, have adopted a marketing plan that has as its central focus targeting directly to those customers a series of misleading

advertisements, all of which contain demonstrably false statements about Merge and its products, including misrepresentations about Merge not being a "stable" company as a result of having retained an investment bank to help it "explore strategic alternatives."  Merge's first encounter with Medstrat in this regard, in fact, came when Merge learned that Medstrat had prepared and disseminated an advertising piece that contained a PowerPoint slide that had been part of an invitation-only presentation to Merge's customers, and was conspicuously labeled "Merge Healthcare – Confidential."  Since that time, Defendants' efforts have only become more egregious and harmful to Merge.  Defendants' conduct is plainly prohibited by state and federal law, and they should be held accountable for these gross violations.

## **Parties, Jurisdiction, and Venue**

2.      Merge is a Delaware corporation with its principal place of business in Chicago, Illinois.

3.      Medstrat is a Delaware corporation with its principal place of business in Downers Grove, Illinois.

4.      MIR, upon information and belief, is a California limited liability company with its principal place of business in Colfax, California.

5.      Bowman, upon information and belief, is a citizen of the State of Colorado.

6.      Huss, upon information and belief, is a citizen of the State of California.

7.      Carr, upon information and belief, is a citizen of the State of Maryland.

8.      Jurisdiction is proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1367, as Defendants' conduct is prohibited by, among other laws, 15 U.S.C. § 1125.

9.      This Court has personal jurisdiction over Medstrat, as it has its principal place of business in this judicial district.

10.    This Court has personal jurisdiction over Bowman, MIR, Huss, and Carr as each of these Defendants individually communicated false, misleading, and/or disparaging statements about Merge and purposefully directed those comments to Illinois.  Specifically, Defendants made these statements with the intention that they disrupt Merge's sales that originate in Illinois and interfere with Merge's Illinois-based contractual relationships and business expectancies. Additionally, the statements were made for the express purpose of benefiting Medstrat—an Illinois-based corporation—at Merge's expense.

11.    Venue is proper under 28 U.S.C. § 1391(b), as a substantial portion of the events giving rise to the causes of action at issue here occurred in this district.

## Allegations Common to All Counts

*Merge's and Medstrat's PACS Product Offerings*

12.    Merge and Medstrat are competitors in the field of medical-imaging technology.

13.    The product offering at issue here is each company's Picture Archive and Communication System, or "PACS."  Broadly defined, a PACS is a combination of hardware and software that allows facilities that capture medical images—including x-rays and MRIs, for example—to electronically store, access, and share those images with various end users.  For example, using a PACS, a stand-alone MRI facility can upload a digital image of a patient's MRI, store it electronically, and share it with users at remote locations, including the patient's primary physician, orthopedic specialist, and physical therapist.  A PACS actually enables all end users to view and analyze an electronic image simultaneously.  The system is designed to replace the costly, cumbersome, and inefficient process of storing and sharing images only in hard-copy form.

14.     Medstrat's exclusive target market for its PACS is orthopedic practices.  Merge, by contrast, has multiple PACS product lines that are marketed to practices across numerous disciplines and specialties, including orthopedics.

15.     A PACS is comprised of both hardware and software, and Merge sells both components to its customers.  Merge sells its PACS hardware through a partnership with Dell, Inc., and licenses its own PACS software directly to its customers.

16.     Merge also offers each of its customers the option to enter into a support agreement, which entitles the customer to two basic services.  First, the customer can receive software updates and upgrades to its existing PACS product.  Additionally, the support agreement gives the customer access to Merge's support department, which provides assistance with using, configuring, and, where necessary, fixing the PACS product.  The term of a support agreement is typically one year, renewable annually at the customer's option.

17.     Merge's customers are not required to purchase service agreements, but a primary focus of Merge's marketing efforts is entering into support agreements with customers that do not currently have them, and, for customers that are on support agreements, renewing those agreements, as well as, where possible, upgrading customers to agreements that include enhanced services.

*Merge's Stryker Customer Base and Medstrat's Efforts to Convert Those Customers*

18.     A portion of Merge's orthopedic-facility customer base consists of legacy customers of a company called Stryker Imaging Corporation ("Stryker Imaging").  Merge purchased Stryker Imaging from Stryker Corporation in July 2010.  As part of that purchase, Merge acquired the rights to an orthopedic-specific PACS (known as the "Stryker Power PACS") that had, by the time Merge acquired the business, already been installed in a number of

facilities. That is, upon completion of the acquisition, many customers that had purchased Stryker Power PACS became customers of Merge.

19.     Defendants have embarked on a marketing effort targeted specifically to these legacy Stryker customers.

20.     Defendants' efforts, however, have been marked by deliberately false and disparaging statements about Merge and its products, and they should be forced to account for the harm these statements have caused Merge.

21.     From the nature of the false and misleading advertisements and communications, it is apparent that Defendants believe that some of Merge's legacy Stryker Imaging customers experienced an unpleasant transition when Merge acquired Stryker Imaging, and Defendants are attempting to scare those customers into believing that another disruptive transition is imminent.

22.     Defendants' efforts to confuse Merge's customers into believing that an unwelcome change is soon to occur appear to be based on two separate facts that Defendants distort to their own improper ends.

23.     First, Merge, after having, over the last several years, acquired companies (like Stryker Imaging) that sold PACS products on numerous different platforms, has undertaken to integrate these various solutions into a single PACS platform. That single platform will, in turn, become the basis for a number of different PACS products tailored to particular practices and specialties. Most relevant to this dispute is the Merge OrthoPACS™ product, a solution customized for orthopedics practices. While Merge would like to convince all of its customers to purchase or upgrade to the new PACS platform—including, for its customers with orthopedic practices, Merge OrthoPACS™—provided that the new product fits with the customer's strategic and organizational objectives, customers will not be forced into converting to a new

PACS product.  For those not interested in converting, Merge is more than willing to continue providing support for their existing products.  Merge is not, in any respect, dropping—or to use the industry jargon, "sunsetting"—any product, including, in particular, the legacy Stryker Imaging PACS.  Defendants have made contrary representations to the marketplace.

24.     Second, Merge recently disclosed in a press release that it has retained an investment bank to, "assist in exploring and evaluating a broad range of strategic alternatives, including, but not limited to, a sale of the Company or a business combination."  A true and correct copy of the press release is attached hereto as Exhibit A.  In that press release, Merge made clear that it "does not have a defined timeline for the strategic review, and there can be no assurance that the review will result in any specific action or transaction."  Defendants, however, have made unqualified representations that Merge is "for sale," going so far in some cases as to question whether Merge is a "stable" company.

25.     Merge is aware of nearly forty accounts that have converted from Merge to Medstrat during the period when Defendants were publishing in their advertising and other marketing communications false and misleading comments about Merge and its products, and Medstrat itself boasts of having converted 35 Merge/Stryker accounts over the past 18 months.  To the extent any of those converted accounts left Merge in response to misstatements about Merge in Medstrat's marketing materials, Defendants should be forced to compensate Merge for this loss in revenue.  Based on the value of the typical support contract, Merge's total lost revenue could reach tens of millions of dollars.

26.     Moreover, Merge remains under the threat of further conversions premised on false information, and also continues to suffer harm that is impossible to quantify or remedy with money damages, so it is therefore appropriate to enjoin these false and disparaging comments.

*The April 2012 Marketing Piece*

27.     In April 2012, Merge learned that Medstrat had communicated, through its representative Bowman, the marketing piece attached hereto as Exhibit B (the "April 2012 Marketing Piece"). Entitled "Why Convert From Merge/Stryker to Medstrat," the piece prominently features a PowerPoint slide that had been a part of an invitation-only presentation that Merge gave to its customers and had been clearly labeled "Merge Healthcare – Confidential."

28.     On its face, the April 2012 Marketing Piece is designed to reach a broad group of Merge's legacy Stryker Imaging customers, in that it purports to offer reasons why the target should convert from Merge to Medstrat, with specific reference to the Stryker Imaging product. Merge received a copy of the advertisement after it was sent directly to one of Merge's customers. Upon information and belief, the April 2012 Marketing Piece was sent to numerous existing Merge customers.

29.     In the April 2012 Marketing Piece, Medstrat and Bowman make a number of factual statements about Merge and its products. A striking number of these unqualified factual statements are demonstrably false, and Defendants knew or had reason to know of their falsity when they included them in an advertisement directed to Merge's customers. Specifically, all of the following factual statements are false to the extent they discuss the nature and scope of Merge's product and service offerings:

    a.   "Merge doesn't support PACS SERVER HARDWARE
         o  Medstrat service includes hardware support and server replacement"

    b.   "Merge's service contracts are SOFTWARE only
         o  Medstrat provides both hardware and software service"

    c.   "Merge's service contract cost (sic) 30% more than Medstrat's service contracts and we provide three things they don't:

- o We include Hardware support
- o We provide replacement of server hardware in our contract
- o We provide an Automatic, offsite, image back up service."

d. "Merge software upgrades will not be geared towards Orthopedics
- o Rest assure (sic), all the money you spend on your service contract with Medstrat will go towards upgrades that improve Ortho workflow."

e. "Merge only runs on the WINDOWS operating system.
- o Medstrat runs natively on MAC & WINDOWS platforms"

f. "Inevitably, Merge is going to move you off of Stryker POWER PACS and on to their NEW 7.0 PACS system. Since your doc's (sic) are going to have to learn something completely NEW anyway, please consider other options."

g. "Since you will have to upgrade your existing PACS hardware (again) to upgrade to Merge's new PACS system, please consider other options."

30. All of the preceding statements are demonstrably false, or are based on demonstrably false presumptions, and each is potentially material to a customer's decision to purchase from, or remain a customer of, Merge. Specifically, each is designed to induce a negative belief about some aspect of Merge or its products, as well as communicate that Medstrat is able to fulfill the need that the advertisement misleadingly claims that Merge cannot.

*Merge's Cease-and-Desist Notice, and Correspondence Between the Parties' Counsel*

31. After becoming aware of this false and misleading advertising, Merge, through counsel, contacted Medstrat and instructed it to cease and desist all further communications that incorporated Merge's confidential information and/or made false factual statements about Merge or its products. A copy of Merge's letter to Medstrat is attached hereto as Exhibit C.

32. Medstrat's counsel responded with a letter that acknowledged Merge's complaint, and stated that Medstrat was "committed to addressing all competitors' legitimate concerns" and "ensur[ing] that product and service comparisons and contrasts remain accurate." A copy of Medstrat's counsel's correspondence is attached hereto as Exhibit D.

33.     Counsel for Merge and Medstrat exchanged another round of correspondence after speaking again.  Merge's counsel's e-mail communication is attached hereto as Exhibit E, and Medstrat's counsel's follow-up letter is attached hereto as Exhibit F.

34.     Having communicated the message clearly, and having understood from Medstrat's counsel's representations that Medstrat had no intention of making any further misrepresentations about Merge or its products, Merge did not expect to again see its name or product information used in a misleading way in a Medstrat advertisement.

*The September 2012 E-mail Advertisement*

35.     Just a few weeks later, however, Merge became aware of another advertisement that Medstrat has directed to Merge's existing and prospective customers.  This communication again contains false and misleading statements about Merge.  A copy of this communication is attached hereto as Exhibit G (the "September 2012 E-mail Advertisement").

36.     Merge became aware of the September 2012 E-mail Advertisement, as it had the April 2012 Marketing Piece, when one of Merge's customers sent it a copy of what it had received directly from Medstrat.  Like the April 2012 Marketing Piece, the September 2012 E-mail Advertisement is a generic communication, plainly intended to reach a broad audience of Merge's legacy Stryker Imaging customers.

37.     The focus of the September 2012 E-mail Advertisement, entitled "Medstrat Minutes" is Merge's announcement that it had retained an investment bank "to assist in exploring and evaluating a broad range of strategic alternatives, including, but not limited to, a sale of the company or a business combination."

38.     The plain terms of the press release did not justify a claim that a sale or merger was imminent, and to suggest or imply that Merge's retention of an investment bank reflected

any instability at the company or posed any risk to Merge's customers would be false and misleading. But that is precisely the approach that Medstrat takes in its September 2012 E-mail Advertisement.

39. First, Medstrat states that, if Merge's customers were to stay with Merge, they would "likely need to change [their] PACS software in its entirety." This statement is false.

40. The September 2012 E-mail Advertisement later states—under the heading "Have you googled (sic) Merge recently?"—that "[a] simple internet search reveals that Merge plans to sell the company or merge yet again." (*See* Exhibit G). The press release that is the basis for Medstrat's misleading conclusion, however, makes clear that Merge has simply retained an investment bank to explore various alternatives and may take no action at all. Medstrat's statement that Merge "plans to sell the company or merge yet again" is thus deliberately false and misleading.

41. More troublingly, Medstrat goes on to state in the September 2012 E-mail Advertisement that Merge is not a "stable" company, and suggests that Merge's customers would be safer with another entity. Specifically, posing rhetorical questions in the voice of Merge's customers, Medstrat asks "[w]ould we prefer to be with a stable company that allows us to confidently plan for the future?". Here, Medstrat is clearly communicating that Merge is not a stable company from a financial or organizational standpoint, and customers that remain with them bear the risk that Merge will cease to exist or otherwise be unable to provide the products and services that its customers have come to expect.

42. Medstrat sent a foreboding advertisement to Merge's Stryker Imaging customer base specifically because it believes that a misleading message about turnover at the company would resonate with them. Any time that an important vendor—such as an orthopedic facility's

PACS provider—undergoes a change at the corporate level, some measure of disruption and inconvenience is inevitable. Though Merge believes it handled the transition from Stryker Imaging as seamlessly as possible, Medstrat is clearly hoping that many legacy Stryker Imaging customers had an unfavorable experience when Merge acquired Stryker, and is falsely claiming that another such transition is imminent for them.

*The September 18 Customer Communication*

43.     Later, Merge learned of an e-mail communication (the "September 18 Customer Communication") sent by Carr on behalf of Medstrat that contains a number of false and disparaging statements about Merge. A copy of the September 18 Customer Communication is attached hereto as Exhibit H.

44.     In the September 18 Customer Communication, Carr makes a number of false statements about Merge's products and business operations in an effort to divert business to Medstrat.

45.     First, Carr states that Merge was "dropping the Stryker PACS line." This statement is categorically false.

46.     Carr also claims that Merge was in the process of "putting everyone in one of their other PACS which is not Orthopedic specific." This is also false. Merge OrthoPACS™ has functionality that is specific to orthopedic practices.

47.     Finally, Carr declares that Merge is "putting the company up for sale," suggesting that Merge had decided to sell itself and that such a sale is imminent. This statement, however, is not consistent with the press release that Merge communicated on this subject. Here again, Medstrat is attempting to scare Merge's customers into believing that another disruptive

corporate transition is imminent, and it is using false and misleading statements in order to communicate that message.

*The October 2012 E-mail Advertisement*

48.     A few weeks after the September 18 Customer Communication, Merge became aware of another e-mail advertisement that was sent from Medstrat—through Huss and MIR— to a group of recipients that included at least one of Merge's customers.   A copy of this communication is attached hereto as Exhibit I (the "October 2012 E-mail Advertisement").

49.     Like the other two advertising pieces discussed above, the October 2012 E-mail Advertisement was sent directly to a Merge customer, but is, on its face, intended to reach a broader audience of Merge's legacy Stryker Imaging customers.

50.     The October 2012 E-mail Advertisement was sent on Medstrat's behalf by Huss, ostensibly a sales representative for MIR.

51.     Among other things, the October 2012 E-mail Advertisement states: "You probably know that Merge is discontinuing support of your Stryker PACS System by the end of 2013."  This statement is false.  Merge will continue to support those products for as long as its customers choose to use them.

52.     Medstrat then builds off of its knowingly false premise that Merge will not continue to support the Stryker Power PACS by appealing directly to the legacy Stryker Imaging customers and offering them various incentives for converting from Merge to Medstrat.

**Count I**
**Violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125)**
**(Against Medstrat, MRI, Bowman, and Huss)**

53.     Merge incorporates and realleges the allegations in Paragraphs 1 through 52 as though fully set forth herein.

54.     The April 2012 Marketing Piece, the September 2012 E-mail Advertisement, and the October 2012 E-mail Advertisement constitute commercial advertisements that were published to Merge's customers and potential customers.

55.     As stated above, the April 2012 Marketing Piece, the September 2012 E-mail Advertisement, and the October 2012 E-mail Advertisement all contain false statements of fact about Merge's products, services, and commercial activities.

56.     These false statements have already deceived, or have a tendency to deceive, a substantial segment of Merge's customers.

57.     These false statements are material, in that they are likely to influence a customer's decision to purchase from, or remain a customer of, Merge.

58.     These false statements were made within interstate commerce.

59.     Merge has been, and is likely to continue to be, injured as a result of these false statements, either by a direct loss in sales or retentions, or through a loss of goodwill associated with its products.

60.     Defendants should be required to pay damages, in an amount to be proved at trial, for the harm caused by their wrongful conduct.

61.     Moreover, Defendants should be enjoined, temporarily and permanently, from publishing advertisements of this nature.

**Count II**
**Violation of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/2)**
**(Against All Defendants)**

62.     Merge incorporates and realleges the allegations in Paragraphs 1 through 52 as though fully set forth herein.

63.     The April 2012 Marketing Piece, the September 2012 E-mail Advertisement, the September 18 Customer Communication, and the October 2012 E-mail Advertisement all contain false or misleading representations of fact that disparage Merge's goods, services, and business.

64.     Merge has suffered harm to its business as a result of these false and misleading statements, and is likely to suffer such harm in the future if Defendants are permitted to continue publishing false and misleading representations of fact about Merge's goods, services, and business.

65.     Merge is constantly in discussions with prospective customers about purchasing from Merge, and with existing customers about remaining with Merge and upgrading to new products and services.  False and misleading statements like those outlined above have influenced, and can continue to influence, purchasing decisions, and Merge will suffer irreparable harm if they are not enjoined.

66.     Medstrat's conduct is prohibited by the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/2) and should be enjoined.

**Count III**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**(815 ILCS 505/2)**
**(Against All Defendants)**

67.     Merge incorporates and realleges the allegations in Paragraphs 1 through 52 as though fully set forth herein.

68.     The false and misleading statements contained within the April 2012 Marketing Piece, the September 2012 E-mail Advertisement, the September 18 Customer Communication, and the October 2012 E-mail Advertisement all constitute deceptive acts within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act.

69.     The April 2012 Marketing Piece, the September 2012 E-mail Advertisement, September 18 Customer Communication, and the October 2012 E-mail Advertisement were all communicated to Merge's customers and prospective customers, all of which constitute "consumers" within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act.

70.     Defendants made the false and misleading statements in the April 2012 Marketing Piece, the September 2012 E-mail Advertisement, the September 18 Customer Communication, and the October 2012 E-mail Advertisement with the intention that consumers rely on those statements in deciding whether to remain a Merge customer, and/or whether to purchase products and services from Merge.

71.     The false and misleading statements in the April 2012 Marketing Piece, the September 2012 E-mail Advertisement, the September 18 Customer Communication, and the October 2012 E-mail Advertisement were made in trade and commerce, and were either directed generally to the market for Merge's and Medstrat's products or otherwise implicate important consumer-protection concerns, including, in particular, consumers' interests in making purchasing decisions based on truthful advertising.

72.     The deceptive acts at issue here primarily and substantially occurred in Illinois, as they were made by or on behalf of Illinois-based defendants with the goal of interrupting and

interfering with Illinois-based sales, contractual relationships, and prospective economic advantage.

73.     Defendants should be required to pay damages, in an amount to be proved at trial, for the harm caused by their wrongful conduct.

**Count IV**
**Tortious Interference With Prospective Economic Advantage**
**(Against All Defendants)**

74.     Merge incorporates and realleges the allegations in Paragraphs 1 through 52 as though fully set forth herein.

75.     Defendants directed false and misleading statements about Merge and its products to Merge's customers, with the goal of convincing those customers to convert from Merge to Medstrat.

76.     Merge had reasonable and realistic business expectancies concerning its ability to retain its existing customers, as well as renew or upgrade its customers' existing support agreements.

77.     By the nature of the communications, Defendants were aware of Merge's existing business expectancies with its customers, and were targeting those customers specifically as a result of such relationships.

78.     Defendants acted purposefully, and with an intent to prevent Merge's reasonable business expectancies from being fulfilled.

79.     Merge has been damaged as a result of Defendants' wrongful interference, as customers declined to renew their PACS-software licenses, and/or enter into, renew, or upgrade their support agreements with Merge, and instead purchased PACS hardware, licensed PACS software, and/or entered into support or service agreements with Medstrat.  Further, Merge

suffered a loss of goodwill, damage to its competitive position in the marketplace, and a threatened loss of future accounts as a result of such wrongful communications.

80.     Defendants should be required to pay damages, in an amount to be proved at trial, for the harm caused by their wrongful conduct.

**Count V**
**Defamation**
**<u>(Against Medstrat)</u>**

81.     Merge incorporates and realleges the allegations in Paragraphs 1 through 52 as though fully set forth herein.

82.     Medstrat's statements in the September 2012 E-mail Advertisement that Merge is for sale or attempting to merge with another company, and is therefore not a "stable" entity, are false and damaging to Merge.

83.     Medstrat made those statements with knowledge of their falsity, or with reckless disregard for their truth.

84.     At a minimum, Medstrat was grossly negligent in the dissemination of information that questioned Merge's stability as an organization.

85.     The statement that Merge is not a "stable" entity as a result of what Medstrat falsely alleges to be its imminent sale or merger is defamatory *per se* under Illinois law.

86.     Merge should be awarded compensatory and punitive damages for Medstrat's wrongful conduct.

**<u>Prayer for Relief</u>**

WHEREFORE, Plaintiff Merge Healthcare Incorporated prays for an order and judgment of this Court granting relief in its favor and against Defendants Medstrat, Inc.; Medical Imaging Resources, LLC; Mark Bowman; Ted Huss; and William Carr; including the following:

    a.        An award of all actual damages to Merge, in an amount to be proved at trial.

    b.        An award of punitive damages based on Medstrat's willful and malicious conduct.

    c.        An injunction against Medstrat, precluding the use in Medstrat's advertising or marketing communications of any false or misleading statement about Merge or its products.

    d.        Any additional relief that the Court deems just and proper under the circumstances.

MERGE HEALTHCARE INCORPORATED

By:  s/ Matthew J. Kramer
        One of its Attorneys

Michael J. Summerhill
Matthew J. Kramer
Julian C. Wierenga
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606-6677
312.360.6000

Dated: November 14, 2012